IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2024 Session

**STATE OF TENNESSEE v. RUSTY L. PATTERSON**

**Appeal from the Criminal Court for Knox County**
**No. 123161   Steven Wayne Sword, Judge**

_____

**No. E2023-01736-CCA-R3-CD**

_____

The Defendant, Rusty L. Patterson, was convicted in the Knox County Criminal Court of theft of property valued $2,500 or more, a Class D felony. After a sentencing hearing, the trial court sentenced him as a Range III, career offender to twelve years in confinement with sixty percent release eligibility. On appeal, the Defendant contends that the trial court committed plain error by refusing to instruct the jury on attempted theft, that the evidence is insufficient to show the value of the stolen property, and that the unavailability of the community corrections program in Knox County violated his constitutional rights at sentencing. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and TOM GREENHOLTZ, J., joined.

Eric Lutton, District Public Defender, and Jonathan Harwell, Assistant Public Defender (on appeal), and George Waters and Jacob Feuer (at trial), Knoxville, Tennessee, for the appellant, Rusty L. Patterson.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald and Teddy Ryan, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case relates to the Defendant's theft of a motorcycle on October 8, 2021. In December 2022, the Knox County Grand Jury indicted him for theft of property valued

$2,500 or more but less than $10,000, a Class D felony. The Defendant went to trial in May 2023.

At trial, thirty-year-old Daniel McGeorge testified that he lived in Claiborne County but was employed by a roofing company in Knoxville. In October 2021, Mr. McGeorge advertised his 2015 Honda CBR motorcycle for sale on Facebook Marketplace. He said that he thought he paid $6,000 when he bought the motorcycle new in 2015 and that he did not remember his asking price when he listed the motorcycle for sale in October 2021. His listing included a photograph of the motorcycle, and "different people" messaged him about the motorcycle, including the Defendant. Mr. McGeorge did not know the Defendant.

Mr. McGeorge testified that he and the Defendant agreed to meet so that the Defendant could look at the motorcycle. They ultimately agreed to meet in the parking lot of the Home Depot on Clinton Highway in Knoxville on the evening of October 8. That day, Mr. McGeorge worked in Knoxville. After work, he drove to his home in Claiborne County and loaded the motorcycle into the back of his pickup truck. He strapped down the motorcycle so it would not fall out of the truck and "headed down" to Knoxville. Mr. McGeorge's wife and two sons, who were nine and six years old, accompanied him. When they arrived at the Home Depot parking lot, the Defendant was already present and had been brought there by a man who was driving a black Chevrolet pickup truck. The Defendant and the man got out of the black truck, and Mr. McGeorge talked with the Defendant. Mr. McGeorge did not remember talking with the driver of the black truck.

Mr. McGeorge testified that he "start[ed] the bike up," unloaded it from his truck, and asked if the Defendant wanted to "ride it around the parking lot to see if it suited him." Mr. McGeorge had taken the license plate off the motorcycle because he thought the Defendant was going to buy it. The Defendant "made a lap around the parking lot and then took off on the highway." The driver of the black truck also left the parking lot and traveled in the same direction as the Defendant. Mr. McGeorge thought "something ain't right" and began gathering his belongings so he could try to "catch" the Defendant. Mr. McGeorge drove in the same direction as the Defendant and the black truck but could not find them.

Mr. McGeorge testified that he returned to the Home Depot parking lot and began sending messages to the Defendant via Facebook Messenger. Mr. McGeorge's wife also began messaging the Defendant, but the Defendant did not respond to either of them. At the time of trial, Mr. McGeorge still had not heard from the Defendant. Mr. McGeorge telephoned the police from the parking lot and reported the motorcycle stolen.

- 2 -

Mr. McGeorge testified that after he filed a police report, he and his family began driving back to Claiborne County. Before they got to Union County, the police notified him that the motorcycle had been recovered on Edgemoor Road in Anderson County. Mr. McGeorge obtained the motorcycle from the police impound lot a few days later, but the bike was damaged. He stated that the key was bent in the ignition switch, that the turn signals were "busted," that "a couple of the fairings was busted," that "the gear shift was bent in against the bike," and that one of the foot pegs and the brake lever were bent. He acknowledged that the motorcycle looked like it had been wrecked and said he did not give the Defendant permission to drive the motorcycle to Anderson County.

Mr. McGeorge testified that he never replaced the battery in the motorcycle and that the motorcycle needed a new battery in October 2021. He said he had to "start" the motorcycle every day; otherwise, the battery would not crank the motorcycle. Mr. McGeorge started the motorcycle before he brought it to Knoxville on October 8, and the motorcycle cranked in the Home Depot parking lot before the Defendant test-drove it. When Mr. McGeorge obtained the motorcycle from the police impound lot, the motorcycle would not start because the ignition key had been left in the "on" position, which "ran the battery completely dead."

Mr. McGeorge identified a printout of the messages he exchanged with the Defendant via Facebook Marketplace, and the State introduced the messages into evidence. The messages showed that the Defendant first contacted Mr. McGeorge about the motorcycle on the night of October 7. The Defendant asked if the motorcycle was still available and said he would like to test-drive it. The Defendant offered Mr. McGeorge $2,800 cash but then wrote that he would pay "three [if] the bike has what I want[.]" The next morning, Mr. McGeorge responded that the motorcycle was still available and that the Defendant could look at the motorcycle when Mr. McGeorge got off work. The Defendant and Mr. McGeorge then exchanged, in pertinent part, the following messages:

Mr. McGeorge:     Hey buddy how's around 4:30 sound

The Defendant:    Five or five thirty be better

Mr. McGeorge:     Alright that sounds good to me an the only thing it needs is a battery [I'm] sure you read that but just wanted to make sure you [knew] I just haven't had a chance to buy one yet

The Defendant:    Can I start it and ride it if not do I have to bring a [battery]

Mr. McGeorge:     Yes you can I can jump it [off]

. . .

The Defendant:     You gonna have to work with on the price a lil

Mr. McGeorge:     I'll work with a lil [on] the price what are you
                  thinking?  An how far are you coming

The Defendant:     Imma come from frost bottom good lil drive

                  I might do 3000 if so I'll have the money on me

                  Mayb anyways

                  You do that.  Come off the five

                  Cash

                  Cash Money

. . .

Mr. McGeorge:     Yes I'll come off the 5 cash since [you're] coming that
                  far an it has after market [exhaust pipes] but I think I
                  still have stock [pipes] I'll see if I can find [them].

According to the messages, Mr. McGeorge and the Defendant originally planned to meet at the Walmart in New Tazwell but changed the location to the Rural King in Halls. At 8:45 p.m., Mr. McGeorge was at Rural King and had a telephone conversation with the Defendant.  They decided to change the meeting location again to the Home Depot on Clinton Highway.  Mr. McGeorge said he and the Defendant met in the Home Depot parking lot soon after 10:00 p.m.  The printout showed that Mr. McGeorge began telephoning the Defendant at 10:11 p.m. and that he called the Defendant five times from 10:11 p.m. to 10:31 p.m.  The Defendant did not answer any of the calls.  At 10:32 p.m., Mr. McGeorge sent a message to the Defendant, stating, "Bring my bike back I'm here at Home Depot where we met at[.]"  The Defendant did not respond to the message.  Mr. McGeorge telephoned the Defendant again at 10:32 p.m., 10:38 p.m., 10:41 p.m., 11:08 p.m., and 11:09 p.m., but the Defendant did not answer any of the calls.  The call records for Mr. McGeorge's wife showed that she also telephoned the Defendant repeatedly but that he did not answer any of her calls.  At the conclusion of Mr. McGeorge's direct

testimony, he stated that he thought he and the Defendant agreed on a price of $3,000 for the motorcycle.

On cross-examination, Mr. McGeorge testified that he charged the battery for the motorcycle before he left home to meet the Defendant on October 8 and that he was "pretty sure" the motorcycle "started right up" in the Home Depot parking lot. Mr. McGeorge said that he and the Defendant talked in the parking lot for about five minutes but that they did not discuss the price of the motorcycle because Mr. McGeorge thought they were "clear on that." The Defendant brought his own helmet to Home Depot and wanted to test-drive the motorcycle, so Mr. McGeorge told him, "'You can ride it around here in the parking lot.'" The Defendant "said that sounded good to him." Mr. McGeorge said the motorcycle had six gears, and defense counsel asked, "How fast do you have to get up to to go through all six of them?" Mr. McGeorge estimated that the Defendant would have had to drive the motorcycle forty miles per hour in order for the motorcycle to go through all six gears. The parking lot was large, and the Defendant drove around the parking lot one time. He then drove out of the parking lot toward Oak Ridge Highway. Mr. McGeorge thought the black truck left the parking lot a couple of minutes later. Mr. McGeorge followed the black truck and managed to get the truck's license plate number but "lost him."

Mr. McGeorge testified that after the black truck left the parking lot, he did not expect the Defendant to return with the motorcycle. At 10:26 p.m., Mr. McGeorge contacted the police and reported that the motorcycle had been stolen. About one hour later, he learned the police had found the motorcycle. A towing company pulled the motorcycle out of a ditch and transported it to the impound lot, and Mr. McGeorge had to pay a fee to obtain the motorcycle. He did not remember if he took any photographs of the motorcycle's damaged condition, and he did not take the motorcycle to a repair shop or obtain an estimate to repair the damage. Instead, he ordered the parts and repaired the motorcycle himself. He said that he did not remember the cost to repair the motorcycle but that he later sold it for $2,800. He did not buy a new battery for the motorcycle before he sold it.

Upon being questioned by the trial court, Mr. McGeorge testified that the motorcycle battery would stay charged as long as the motorcycle was operating. He said the motorcycle "wouldn't just die by itself."

Investigator Keith Johnson of the Knoxville Police Department ("KPD") testified that he was responsible for investigating vehicle thefts and that he was assigned to Mr. McGeorge's case. The Anderson County Sheriff's Office ("ACSO") recovered the motorcycle "quickly." From the ACSO's report, Investigator Johnson learned the address on Edgemoor Road where the Anderson County police had located the motorcycle. The homeowner at that address had told the police that someone came to his door and asked for

help with the motorcycle. The homeowner emailed a video of the incident, which the homeowner's Ring camera had recorded, to Investigator Johnson. From the video and the Defendant's profile on Facebook Marketplace, Investigator Johnson was able to determine that it was the Defendant who went to the homeowner's door. The Defendant had used his real name on Facebook Marketplace, so Investigator Johnson also was able to identify him as the person who took the motorcycle.

The State played two video clips from the homeowner's Ring camera for the jury. In the first clip, which was recorded at 10:16 p.m., the Defendant, holding a motorcycle helmet, knocked on the homeowner's door. When the homeowner answered, the Defendant asked for a "boost" and said, "My bike's right here in your driveway." The Defendant said that "the battery is dead," and the homeowner stated that he did not have a way to help the Defendant. The Defendant apologized and walked away. In the second video clip, which was recorded at 10:20 p.m., the Defendant knocked on the homeowner's door and told the homeowner that his "buddy" was coming to help him with the motorcycle.

On cross-examination, Investigator Johnson testified that Mr. McGeorge contacted the police at 10:26 p.m. and that the police recovered the motorcycle about fifteen to twenty minutes later. Investigator Johnson thought the motorcycle had been wrecked, not merely abandoned. He said that he never saw the motorcycle and that he concluded it had been wrecked "from the statements from the victim of the condition the bike was in when he recovered it versus the condition it was in when it was stolen." After Investigator Johnson's testimony, the State rested its case.

Tammy Comerford testified that she worked in the KPD's NCIC Department and that she was responsible for adding and removing stolen items from the NCIC database.[1] Ms. Comerford identified a "cancellation of vehicle" form that she filled out for Mr. McGeorge's motorcycle. According to the form, Ms. Comerford notified Mr. McGeorge at 11:30 p.m. that his motorcycle had been recovered. At the conclusion Ms. Comerford's testimony, the jury convicted the Defendant as charged in the indictment of theft of property valued $2,500 or more but less than $10,000.

## ANALYSIS

---

[1] "NCIC" is the acronym for the National Crime Information Center. *See Bragg v. State*, No. E2023-01247-CCA-R3-PC, 2024 WL 4625135, at *1 (Tenn. Crim. App. Oct. 30, 2024), *no perm. app. filed*.

# I. Attempted Theft Instruction

The Defendant claims that the trial court committed plain error by refusing his request for a jury instruction on attempted theft as a lesser-included offense of theft. He asserts that an attempt instruction was warranted because, given the limited amount of time he drove the motorcycle and the fact that he had to abandon it after he either wrecked it or it suffered a mechanical failure, a reasonable jury could have concluded that he never completed the theft. The State argues that the trial court did not err. We agree with the State.

After the State presented its proof, defense counsel orally requested that the trial court instruct the jury on attempted theft. The trial court refused, stating, "I mean, he drove the thing a county away. I mean, I don't see an attempt on there at all. . . . [T]here's clearly either a completed act or his intent wasn't to permanently deprive him of it at all."

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). Furthermore, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016) (citing *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001)). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (citations and internal quotations omitted).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

Attempted theft is a lesser-include offense of theft. *Id*. at § 40-18-110(f)(3). In charging a lesser-included offense, our Code explains:

When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

*Id*. at § 40-18-110(a).

As noted by the Defendant, in the absence of a written request for a jury instruction on a lesser-included offense, the issue is waived, and we may only review the issue for plain error. *Id*. at § 40-18-110(b), (c); *State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006). An issue rises to the level of plain error when all five of the following factors are met:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

We conclude that a clear and unequivocal rule of law was not breached, that a substantial right of the Defendant was not adversely affected, and that consideration of the error is not necessary to do substantial justice in this case. Mr. McGeorge testified that he met the Defendant in the Home Depot parking lot in Knox County about 10:00 p.m. and that he told the Defendant that the Defendant could test-drive the motorcycle in the store's parking lot. The Defendant drove one lap around the parking lot but then, inexplicably and without warning, drove out of the lot and toward Oak Ridge Highway. Soon after, the black truck that had brought the Defendant to Home Depot also left the parking lot. Mr. McGeorge tried to follow the Defendant and the black truck but was unable to catch up to them. By 10:20 p.m., the motorcycle was in a ditch on Edgemoor Road in Anderson County. Mr. McGeorge and his wife telephoned the Defendant numerous times between 10:11 and 11:09 p.m., and Mr. McGeorge sent the Defendant a message at 10:32 p.m., after the Defendant had wrecked the motorcycle, telling him to bring the motorcycle back to the parking lot. The Defendant left the motorcycle where he had wrecked it, never answered Mr. McGeorge's calls or messages, and never contacted Mr. McGeorge or the police. Therefore, we agree with the trial court that the evidence did not support an instruction on attempted theft and conclude that the Defendant is not entitled to plain error relief.

## II. Sufficiency of the Evidence

Next, the Defendant claims that the evidence is insufficient to show that the motorcycle was worth $2,500 or more when it was stolen. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657

S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *Dorantes*, 331 S.W.3d at 379.

Theft of property valued $2,500 or more but less than $10,000 is a Class D felony. Tenn. Code Ann. § 39-14-105(a)(3). The value of property is "[t]he fair market value of the property or service at the time and place of the offense[,]" or "[i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" *Id*. at § 39-11-106(a)(39)(A)(i), (ii). Tennessee Rule of Evidence 701(b) provides that "[a] witness may testify to the value of the witness's own property or services." It is the jury's prerogative to determine the fair market value of stolen items. *State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981).

In *State v. Felts*, No. M2013-01404-CCA-R3-CD, 2014 WL 2902261, at *1 (Tenn. Crim. App. June 25, 2014), *no perm. app. filed*, the defendant broke into a vehicle and took a laptop computer. The owner of the property testified at trial that he paid about $1,300 for the laptop three or four years before the taking and that he would not be surprised if a three- or four-year-old laptop could be purchased for $700. *Felts*, 2014 WL 2902261, at *1. Nevertheless, the jury convicted the defendant of theft of property valued more than $1,000 but less than $10,000, which at that time was a Class D felony. *Id*. at *4. On appeal, this court found that a jury reasonably could have concluded that the fair market value of the laptop at the time of the theft was more than $1,000. *Id*. at *10.

Here, Mr. McGeorge testified that he paid $6,000 for the motorcycle when he bought it new in 2015. The messages he exchanged with the Defendant show that he listed the motorcycle for sale for $5,000 on Facebook Marketplace in October 2021. The listing included a photograph of the motorcycle, and the Defendant contacted Mr. McGeorge and offered him $2,800 for the bike. The Defendant then said he may be willing to pay $3,000, and Mr. McGeorge testified that he thought he and the Defendant had an agreement for the Defendant to buy the motorcycle for $3,000. After the Defendant wrecked the motorcycle and Mr. McGeorge repaired it, Mr. McGeorge sold the motorcycle for $2,800. We note

that he obtained $2,800 for the motorcycle despite not replacing the old battery. The jury instructions reflect that the trial court properly instructed the jury on how to assess the value of the stolen property. *See State v. Watts*, No. W2010-00705-CCA-R3-CD, 2011 WL 1220766, at *3 (Tenn. Crim. App. Mar. 31, 2011), *no perm. app. filed*. Therefore, viewing the evidence in the light most favorable to the State, we conclude that a jury reasonably could have determined that the fair market value of the motorcycle at the time of the theft was $2,500 or more.

### III. Community Corrections

Finally, the Defendant claims that the unavailability of a community corrections program in Knox County violates his federal and state constitutional rights because (1) the ability for some defendants in Tennessee to receive a community corrections sentence while other similarly situated defendants cannot violates equal protection and (2) the Tennessee Department of Correction's decision to eliminate community corrections violates the separation of powers doctrine. The State argues that the Defendant has waived his constitutional claim and that he is not entitled to plain error relief. We agree with the State.

Before trial, the State filed a notice of intent to seek enhanced punishment and listed twenty-nine prior convictions for the Defendant: three convictions of aggravated burglary, a Class C felony; one conviction of robbery, a Class C felony; one conviction of Class C felony theft; six convictions of Class D felony theft; one conviction of burglary, a Class D felony; four convictions of Class E felony theft; and thirteen convictions of Class E felony forgery. The trial court held a sentencing hearing on August 3, 2023. No witnesses testified at the hearing, but the State introduced the Defendant's presentence report into evidence. The presentence report included the Defendant's Strong-R assessment, which classified him as a high risk to reoffend.

The State asserted that the Defendant was a career offender and introduced into evidence thirteen certified judgments of conviction for robbery, aggravated burglary, burglary, felony theft, and felony forgery. *See* Tenn. Code Ann. § 40-35-108(a)(3) (providing that a career offender is a defendant who has at least six prior felony convictions if the defendant's conviction is a Class D or E felony). The State requested that the Defendant serve the mandatory twelve-year sentence at sixty percent release eligibility in confinement. *See id.* at § 40-35-108(c) (providing that a career offender must serve the maximum punishment within the applicable Range III); *id.* at § 40-35-112(c)(4) (providing that the maximum punishment in Range III for a Class D felony is twelve years); *id.* at § 40-35-501(f) (providing that a career offender does not become eligible for release until serving sixty percent of the sentence).

Defense counsel acknowledged that the Defendant was not eligible for probation. *See id*. at § 40-35-303(a) (providing that a defendant is generally presumed a favorable candidate for probation if the sentence is ten years or less). Defense counsel stated that the Defendant was eligible for community corrections but that because there was no community corrections program in Knox County, "I don't have a program to put before the Court."

The trial court, addressing the Defendant directly, stated:

Your lawyer's right. . . . You would be eligible for community corrections, but about two years ago, the state got rid of the program that we had here in Knox County, they just stopped funding it. And it was kind of their way of -- I don't think -- they wanted to focus all their resources on DRCs across the state. And there was a lot of money going to these community corrections programs, so they sort of pulled all that money out. So we just don't have a program we can put you in. Even though that law's still on the books -- they never changed the law, they just stopped funding it. And so, in essence, they -- they've taken away that resource that we have.

So, really, I -- I have no option. The Court does find, beyond a reasonable doubt, that you are a career offender. It's six, and even looking at the 24-hour rule, you got more than six of those. So I really only have one sentence I can give you, and that's 12 years to serve at 60 percent.

Initially, regarding the State's waiver argument, the Defendant contends in his reply brief that an issue regarding the manner of service of a sentence cannot be waived because an error in sentencing does not result in a new trial. He also contends that, in any event, he has shown plain error because the transcript and pleadings establish what occurred in the trial court, because failing to consider an eligible defendant for community corrections violates the law, because there was no tactical waiver when defense counsel "lamented" the lack of community corrections in Knox County, and because review of the issue is necessary to ensure he receives a lawful sentence.

The Defendant did not raise this issue at sentencing or in his timely motion for new trial. Issues raised for the first time on appeal are waived. Tenn. R. App. P. 3(e); *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) (citing *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996)). Moreover, in *State v. Morris*, No. M2017-01229-CCA-R3-CD, 2017 WL 6375952, at *2 (Tenn. Crim. App. Dec. 13, 2017), *no perm. app. filed*, this court held that the defendant's challenge to the constitutionality of Tennessee Code Annotated section 40-35-108, the career offender statute, was waived

because he failed to raise it in his motion for new trial. Therefore, we agree with the State that we can only review the issue for plain error.

As stated previously we will grant plain error relief when (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *Adkisson*, 899 S.W.2d at 641-42. Additionally, the error must be so significant that it probably changed the outcome of the trial. *Id*. at 642.

The purpose of the Community Corrections Act is to "[e]stablish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders[.]" Tenn. Code Ann. § 40-36-103(1). Defendants eligible for community corrections include:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of property-related, or drug- or alcohol related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
>
> (C) Persons who are convicted of nonviolent felony offenses;
>
> (D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and
>
> (F) Persons who do not demonstrate a pattern of committing violent offenses.

*Id*. § 40-36-106(a)(1)(A)-(F). A defendant's simply meeting the Act's minimum requirements "'does not mean that he is entitled to be sentenced under the Act as a matter of law or right.'" *State v. Diggs*, No. E2018-01755-CCA-R3-CD, 2019 WL 3934622, at *4 (Tenn. Crim. App. Aug. 20, 2019) (quoting *State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998)), *perm. app. denied* (Tenn. Jan. 15, 2020). "Instead, the Act's criteria 'shall be interpreted as minimum state standards, guiding the determination of eligibility of offenders under this chapter.'" *Id*. (quoting Tenn. Code Ann. § 40-36-106(d)).

Turning to the instant case, the Defendant did not specifically request community corrections or make any argument regarding his eligibility for community corrections at his sentencing hearing. Accordingly, the trial court did not make any findings regarding community corrections or determine that it would have placed the Defendant on community corrections if community corrections had been available. On appeal, the Defendant argues that an assumption that the trial court would have denied community corrections "is without support in the record." He concedes that his criminal record "is far from flawless" but notes that community corrections is statutorily available for career offenders, all of whom have "a lengthy history of problematic behavior."

The State filed a notice of enhanced punishment before trial and listed twenty-nine prior misdemeanor and felony convictions in support of enhanced punishment. At sentencing, the State introduced into evidence thirteen judgments of conviction for prior felonies, including two convictions of aggravated burglary and one conviction of robbery, Class C felonies, to establish the Defendant's status as a career offender. We note that a career offender is not presumed to be a favorable candidate for alternative sentencing and that community corrections is an alternative sentence. *See* Tenn. Code Ann. §§ 40-35-102(6)(A); -104(c)(9).

Additionally, we have carefully reviewed the Defendant's presentence report. In the report, the Defendant said that he used illegal drugs, that he supported his drug use by committing theft of property, and that he had never sought treatment for his drug addiction. The Defendant's prior record in the presentence report spans fourteen pages and shows that he has been committing crimes, particularly property crimes, his entire adult life. While we acknowledge that many of the offenses listed in the report were dismissed, the report still shows that he has amassed a criminal record of, by our count, more than fifty misdemeanor and felony convictions; that he has violated his probation five times; and that he had numerous disciplinary infractions in prison. Additionally, his Strong-R assessment classified his overall risk to reoffend as high. In sum, the Defendant's criminal history is abysmal, he has demonstrated a refusal to comply with alternative sentencing in the past, and he is likely to reoffend. Therefore, we conclude that the trial court's inability to consider the Defendant for community corrections was not plain error because no clear and unequivocal rule of law was breached, no substantial right of the Defendant was adversely affected, consideration of the error is not necessary to do substantial justice, and the error also was not of a magnitude that it probably changed the outcome of the trial.

- 14 -

## CONCLUSION

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.


s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE